## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 95-CA-01070-SCT

*DIOGENES EDITIONS, INC. AND ROLAND L.*
*FREEMAN*

*v.*

*STATE OF MISSISSIPPI, BY AND THROUGH*
*BOARD OF TRUSTEES OF INSTITUTIONS OF*
*HIGHER LEARNING AS TRUSTEES FOR THE*
*UNIVERSITY OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/07/95 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOSHUA J. WIENER |
| ATTORNEYS FOR APPELLEE: | MARY ANN CONNELL |
| | LLOYD ARNOLD |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 9/25/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 10/16/97 |

**BEFORE DAN LEE, C.J., McRAE AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Appellants, Diogenes Editions, Incorporated (hereinafter, Diogenes) and Roland Freeman, appeal the judgment of the Hinds County Circuit Court wherein the trial court granted summary judgment to the appellee, the State of Mississippi, by and through the Trustees for the Institutions of Higher Learning and the University of Mississippi and the Center for the study of Southern Culture (hereinafter, the Center or the University). Appellants claimed that the trial judge erred in finding that no issues of material dispute existed which would warrant a finding for the appellants. We affirm in part; reverse and remand in part this case based upon the fact that the University missed its contractually scheduled production deadline. Due to the fact that a breach existed on the part of the University, it is a jury question as to the effect of that breach upon the damages claimed by the

appellants. The question of whether the marketing efforts of the University were active and diligent or timely as required by the contract is also one for the jury.

## FACTS

¶2. This case involves a contract between the parties, Roland Freeman, an internationally renowned documentary photographer, Diogenes editions, Inc., a photographic technical production company owned by D. Gorton, and the University of Mississippi through its Center for the Study of Southern Culture, a division of the University dedicated to the preservation of southern art, music and literature.

¶3. In the summer of 1992, Gorton began discussions with William Ferris, director of the Center, concerning entering into a contract for the production of a limited edition portfolio of the works of Roland Freeman. Before the Freeman project, Diogenes Editions had successfully produced a limited edition portfolio of photographs by Eudora Welty. The Welty Portfolios were successfully marketed through a three party agreement between Ms. Welty, Diogenes, and the Mississippi State Department of Archives. The contract for the Freeman portfolios, which was based upon the one used in the Welty project, was signed by Freeman, Diogenes, and the Center on November 23, 1992.

¶4. In pertinent part, the contract set forth that Freeman, Diogenes, and the Center agreed to produce forty-five Portfolios of Freeman's photographic work. Each portfolio was to contain twelve black and white photographic prints which were to be 16 X 20 inches in size. All portfolios and prints were to be numbered, and each print was to be embossed by Diogenes with a seal mutually agreeable to all the parties. Diogenes was to perform all of the negative work at his own expense. The Center was to advance the funds for the purchase of the portfolio cases and packaging of the portfolios. Cost of the packaging materials was to be split on a one-third basis, to be deducted by the Center on the sale of the first portfolios.

¶5. A publication date (defined as " the first date upon which any of the portfolios may be sold.") was established by the parties as "no later than December 31, 1992." On the publication date, twenty four of the portfolios were to be offered under a "joint marketing arrangement" for a period of six months. During this six month period, the Center was to serve as the sole sales agent and honor orders made or postmarked on or before the last day of the joint marketing period. During the joint marketing period, the price of each portfolio was set at $5,000.

¶6. The remaining twenty one portfolios were to be distributed equally among the Center, Freeman, and Diogenes on the publication date, but were not to be sold until after the expiration of the joint marketing period, and for one year thereafter, could not be sold for any price less than $5,000.

¶7. The Center was to be "primarily responsible" for the marketing activities associated with the Freeman project. Included among its duties was the requirement to produce, at its expense, a brochure featuring all of the prints along with purchasing information to be sent to interested parties. It was to publish information regarding the portfolios in its newsletter, the *Southern Register*, and was to use other methods of communication to inform the public, media, and other institutions of the availability and price of the portfolios being offered during the joint marketing period. It was to request that the news media run stories about the portfolios. Within reason, all parties were to be available for interviews and other public relations and promotional activities. The parties specifically

agreed that the contract constituted the entire agreement between the parties, and was not to be altered unless in writing and such changes endorsed by all the parties.

¶8. In late December, 1992, Diogenes completed the development of the images and attempted to deliver them to the Center. However, it was the Christmas holidays and no one was at the Center who could take the prints before December 31, as required in the contract. Gorton called Ann Abadie, a worker on the project at the Center, who told him to deliver the prints on January 13, 1993, which he did.

¶9. The Center did not send out bid requests for the packaging for the prints until February, 1993. The Center's reasoning was that as a State institution, they were statutorily required to get bids on projects costing between $500 and $5,000. When they submitted the bids, only the Harcourt Bindery submitted a bid. Since the Center had to have at least two bids, they called other firms to see if they were interested in bidding on the project. When none were interested, the Center awarded the packaging contract to the Harcourt Bindery.

¶10. During the joint marketing period, the Center issued a press release touting the yet to be completed portfolios (although no articles which were dated before July 29, 1993 appeared in the record), wrote an article publicizing the portfolios for the *Southern Register*, and Ferris contacted several friends in the media appealing for support and publicity for the project.

¶11. In March, 1993, Gorton, concerned about the lack of results coming from the Center, and the fact that the prints had yet to be packaged, contacted Ferris concerning the project. Ferris sent him a letter stating that the problem was the bid process, and enclosed a copy of the article in the *Southern Register*. On May 28, Gorton sent a letter to Ferris encaptioned "notice of default." Therein he complained that the responsibility to comply with the State bid procedures was that of the Center and did not affect the Center's duty to comply with the terms of the contract. The letter also listed other perceived slights and problems with the Center's handling of the project, including that the marketing brochures were not completed, no portfolios had been sold and that in general, marketing of the project had been minimal. He also complained of the Center's failure to keep him abreast of the progress of the project. Finally, he noted that the Center was in breach of the contract and stated his intention to sue if the Center did not rectify its breach. On June 14, 1993, the Center responded by sending him a copy of the brochures and requesting a list of individuals to whom he might wish a copy of the brochure be sent. On June 28, 1993, Freeman wrote a letter to the Center expressing his frustration at the pace of the project, especially since the joint marketing period was two days from being over, and the prints had yet to be packaged into portfolio form or marketed in a coherent manner. He also expressed his disappointment at not being kept abreast of the project and that he was not sent any brochures as Gorton had been.

¶12. The portfolios were finally assembled and the first one sold in early July, after the joint marketing period. However, the portfolios were never embossed with the seal as required in the contract, and Ferris eventually determined that the embossing was unnecessary.

¶13. On January 28, 1994, Freeman and Diogenes filed suit in this case. The plaintiffs served interrogatories and document production requests on the Center with the complaint, which the Center answered. The trial court entered a Scheduling Order on October 17, 1994, setting November 30, 1993 as the date for completion of discovery and January 16, 1995, as the deadline for filing

pretrial motions.

¶14. The Center propounded interrogatories and document production requests upon the plaintiffs on October 27, 1994. Plaintiffs mailed responses to Defendants discovery on January 31, 1995, two months after the discovery completion date and two weeks after the deadline for the filing of pretrial motions. Plaintiffs filed a Notice of Trial Setting on February 16, 1995, reflecting that the case had been set for trial on May 8, 1995, by agreement of counsel.

¶15. On April 7, 1995, the Center filed a Motion for Leave to File Dispositive Motion and for Stay of Proceedings and Filed a motion for Summary Judgment. After a telephone hearing on April 18, 1995, the trial court granted the Defendants' Motion for Leave to File a Dispositive Motion. A hearing on the Motion for Summary Judgment was held on May 4, 1995. At the conclusion of argument, the trial court took the matter under advisement and ordered the trial continued.

¶16. On September 7, 1995, the trial court entered an Order granting Defendant's Motion for Summary Judgment. Aggrieved, the plaintiffs appeal.

## STANDARD OF REVIEW

¶17. "It is well-settled that a motion for summary judgment challenges the legal sufficiency of all or part of an opponent's case." *Allen v. Mac Tools*, 671 So. 2d 636, 640 (Miss. 1996); *Dawkins and Co. V. L & L Planting Co.,* 602 So. 2d 838, 841 (Miss. 1992). The motion lies only where there is no genuine issue as to any material fact. A fact is material if it tends to resolve any of the issues properly raised by the parties." *Allen v. Mac Tools,* 671 So. 2d at 640.

¶18. This Court conducts a *de novo* review of the record on appeal from a grant of a motion of summary judgment. *Id.* "When reviewing an award of summary judgment, this Court views all evidence in the light most favorable to the non-movant, including admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. and will presume that all evidence in the non-movant's favor is true." *Id.* If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, this Court affirms the decision. *Id.; Brown v. Credit Center, Inc.,* 444 So. 2d 358, 362 (Miss. 1983).

## DISCUSSION OF LAW

¶19. Freeman and Diogenes list two issues for appeal:

## I. WHETHER THE TRIAL COURT ERRED IN GRANTING THE CENTER'S MOTION FOR LEAVE TO FILE A MOTION FOR SUMMARY JUDGMENT.

¶20. The appellants contend that the trial judge should not have granted the Center leave to file its Motion for Summary Judgment because the court had set a pretrial motion deadline of January 16, 1995, and both the Motion for Leave and the Motion for Summary Judgment were filed and granted beyond that deadline. Appellants base their argument in the language of M.R.C.P. 6(b), which states:

> When . . . by order of the court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time within its discretion (1)with or without motion or notice order the period enlarged if request is therefore made before the expiration of the

period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where failure to act was the result of excusable neglect . . .

¶21. The Center listed as its "excusable neglect" the fact that the plaintiffs did not answer its written discovery responses until after the January 16 deadline, and that it therefore could not evaluate these responses to see if the case was ripe for summary judgment until after the deadline. Freeman and Diogenes insist that the appropriate direction for the Center to take would have been to file for an extension of the pretrial deadline before January 16.

¶22. We find that summary judgment motions for defendants are governed specifically by M.R.C.P. 56(b), which states:

A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

¶23. The Center was the defendant on the trial level in this case, and, therefore, was free to move for summary judgment at any time. Furthermore, it is well settled that specific statutes govern over general ones. *Lenoir v. Madison County*, 641 So. 2d 1124, 1129-30 (Miss. 1994); *Wilbourn v. Hobson*, 608 So. 2d 1187, 1191 (Miss. 1992). Though we could find no cases which apply the rules of statutory construction to the M.R.C.P. in terms of the application of one rule over another, we hold nonetheless that the same principal applies. As a result, this Court finds that the appellants' first assignment of error is meritless.

## II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT.

¶24. Freeman and Diogenes claim that the court should have denied the Center's Motion for Summary Judgment because at least one material factual dispute existed. That being whether or not the Center breached the contract by failing to have the portfolios ready on the publication date. The Center claims that no breach existed and that the Court was correct in granting the Motion because the publication date was clearly defined in the contract as being the first date upon which any of the portfolios could be sold. As such, the Center claims that it had not breached the contract because it could have sold the portfolios on that date.

¶25. Contracts are read as a whole so as to give effect to all of their provisions. *Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 124 (Miss. 1992). In this particular contract, twenty-one of the portfolios were to be distributed to the three parties to the contract equally on the publication date. These could not be sold for six months. It is not readily apparent to this Court how those portfolios could be distributed on the publication date if they were not yet assembled. Nor is it apparent how the Center, which had primary responsibility for marketing the portfolios, and had enumerated responsibilities to that end, could hold the portfolios for sale on the publication date when, by its own admission, it did absolutely nothing to let anyone other than the parties to the contract know that the portfolios even existed until February, 1993.

¶26. Further, Diogenes and Freeman claim that the Center's marketing of the portfolio was haphazard and insufficient to the task. The sufficiency of the Center's marketing effort is also a question of fact

which is properly decided by a jury. It was shown from the record that the Center did not send a mass mailing out to various museums, galleries, and individuals that it thought would be interested in the portfolios until August 18, after the joint marketing period was over. Whether such a late advertisement breached the contract was a jury question. There is also the assertion on the part of Diogenes and Freeman that Ferris unilaterally decided that the portfolios did not have to be embossed. Whether or not such a decision was unilaterally made, was the decision of Ferris, or resulted from some failure to act on the part of Diogenes, who had the responsibility to emboss the portfolios is similarly, a question of fact which is properly decided by a jury.

¶27. As a result, this Court finds that the trial judge should have denied the Motion for summary Judgment and allowed this case to proceed to trial.

## CONCLUSION

¶28. We find that the trial judge was correct in granting the defendant's Motion for Leave to File a Dispositive Motion because M.R.C.P. 56(b) specifically holds that a Motion for Summary Judgment is proper at any time. M.R.C.P. 6(b) is a general rule applying to the scheduling of pretrial motions and is therefore subject to the specific provisions of M.R.C.P. 56(b). The Court finds that the trial judge erred in granting the Motion for Summary Judgment because their existed several issues of material fact, primarily as to whether the contract had been breached, and the effect of any such breach on the success of the project which would preclude a grant of a Motion of Summary Judgment for the defense.

¶29. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS AND MILLS, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY.**